## Brown v. Commonwealth.

(Decided Sept. 28, 1934.)

C. B. WHEELER and B. M. JAMES for appellant.

BAILEY P. WOOTTON, Attorney General, and H. H. RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant and defendant below, George Brown, prosecutes this appeal from a judgment, and the verdict upon which it was based, sentencing him to confinement in the penitentiary for seven years at the trial of an indictment in the Floyd circuit court accusing him of murdering Henry Adams. The grounds for reversal argued in brief of counsel for defendant are: (1) Error of the court in admitting incompetent evidence; (2) error in rejecting competent evidence; (3) error in overruling defendant's motion for a directed verdict of acquittal; (4) the verdict is flagrantly against the evidence; and (5) erroneous instructions, each of which will be disposed of in the order named.

1. The alleged incompetent evidence relied on may all of it be classified as trivial, immaterial, and inconsequential, while some of it was not even objected to at the time it was given, but later in the trial the same evidence was objected to, and which did not have the effect to exclude from the consideration of the jury that which had previously been given without objection. But, independently of that fact, we repeat, none of it arose to the dignity of the slightest materiality. An illustration of one item of the class of testimony complained of under this ground will be sufficient to substantiate our conclusion. A prosecuting witness was asked: "Do you remember the day Henry Adams was killed?" He answered: "Yes sir, pretty well." That question and answer was not objected to at the time, but it was done later in the trial, when the same language was employed in asking a different question. The court then stated in the presence of the jury: "You might frame your questions so as to say 'On the morning he died' instead of 'On the morning he was killed.'" When the attorney reframed the question it read: "On the morning he lost his life." Another item in the same class is furnished by the infinitesimal portion of all the testi-

mony contained in the transcript of the evidence saying: "Who had put that fence post there?" And the answer: "I reckon Henry Adams had," the objection being directed to the use of the word "reckon." Technically each of those complaints may have been correct, but if so the first one was evidently cured by the statement of the court in the presence of the jury, and the second one was wholly immaterial in the connection with which it was given, because defendant admitted wounding the deceased in the manner set out in the indictment on the late forenoon of the day in which he died that night, and the only defense was that his striking deceased was (a) in his necessary self-defense, and (b) that the evidence was insufficient to show that deceased lost his life as a proximate result of the wound. Without listing the other items complained of in ground 1, we deem it sufficient to say that none of the unnamed ones are any more material or prejudicial than the two we have enumerated, and for the reasons stated this ground is without merit.

2. An illustrative item of excluded evidence complained of under ground 2 was that given by the defendant's witness Levy Prater, who testified about seeing the deceased at the mill after the wounds had been inflicted upon his body by defendant and that "he was cursing George Brown." The commonwealth objected to that statement and the court said: "Any conversation he had with him there, or any expression he made there, is not competent and the jury will not consider it, except about his condition." We think the court was correct, since it is not claimed that the statement by deceased so sought to be proven was a dying declaration, and could not possibly have any effect upon the issues in the case, except its possible remote bearing upon the feelings of decedent toward defendant, but which, whatever they were, would naturally be produced from the assault made by defendant upon the declarant. We regard this, if error at all, as one of many immaterial departures from the correct practice which may be found in the trial of nearly every cause, either civil or criminal. The few other items relied on are no stronger than the illustrative one, and because of which this ground must be declared as unavailing.

3 and 4. Grounds 3 and 4, which affect the sufficiency of the evidence to sustain the conviction, may be

disposed of together, and which calls for a brief statement of the substance of the testimony. Deceased and one Holbrook owned adjoining farms. A controversy had long existed as to the true location of the line between them. Defendant had rented that portion of the Holbrook farm lying next to the one owned by deceased and had ploughed some ground which the latter claimed was on his land, and he accordingly constructed a fence at the place where he contended the true line was. Defendant tore it away, when deceased remarked that he would make the one who tore it away pay for it. Between 10 and 11 o'clock on the morning of the fatal day, deceased and others were passing the spot upon a road along the fence inclosing the farms. They were going to mill, and were riding horses and mules. A very intelligent prosecuting witness met them at that point returning from the mill and the parties engaged in conversation, during which defendant was seen in the field about 150 yards away approaching the spot where the witnesses and deceased were conversing. He traveled in a trot and had a hoe in his hands, and when he got near the fence he addressed the deceased, saying: "Mr. Adams, I am the man that tore the fence down, God damn you." Whereupon deceased replied: "I will make you pay for it too." Other conversation followed, but it is not clear as to what it was and no one claims that it affected the case. While the badinage of words between the parties was going on, defendant climbed over the fence with his hoe, and when he did so the deceased dismounted from the animal he was riding, and some of the witnesses stated that he ran his hand in his pocket but immediately withdrew it with nothing in it, and then picked up a rock which he threw at defendant, who was then close, but missed him. Whereupon defendant struck decedent twice with the hoe, inflicting a wound on his left arm and another on his side, the lick breaking the hoe handle. Decedent went to mill and was making some complaints there but mostly of the wound on his arm. He returned to his home not far from the mill and was soon seized with an uncontrollable nausea and a constant urge for bowel evacuation. Such symptoms, with resultant spasms of great pain, continued and grew worse, and about 9 o'clock that night the patient died.

Other prosecuting witnesses testified to threats made by defendant against deceased, generated no doubt

from the feeling produced from the contention over the line separating the two farms. It will thus be seen that there is no room for the argument of counsel in support of ground 3, since there was abundant testimony to show that defendant was the author of the difficulty and may not be shielded by his right of self-defense, even if it were more satisfactorily proven. But there was at least an issue as to whether the testimony justified defendant in acting in his necessary self-defense at the time he struck decedent, provided nothing existed to impair or qualify his right to such reliance.

In support of these two grounds (3 and 4) it is also insisted by counsel that there was a failure of proof sufficient to sustain a finding that decedent's death proximately resulted from the wounds he received at the hands of defendant. Only one physician testified in the case, and he was Dr. M. T. Dotson, the family physician of decedent, and who lived but a short distance from his residence. A call was received by the doctor to visit decedent at his home some time in the afternoon after he returned from the mill, and after the symptoms we have described developed, but it described decedent's symptoms only, without informing the doctor of the wounds that he had received earlier in the day, and having an urgent call to a patient in an adjoining county, the physician directed the use of remedies for allaying the nausea described to him and went away on his journey to visit his distant patient. Upon his return that night he learned of decedent's death, and the next day he examined his wounds. The one on decedent's arm was a gash about an inch deep, and the one on his side was about three or four inches long, but with no gash, there being only a severe bruise having the appearance of being inflicted with some blunt instrument with great force, and it was located "in the back part of his [decedent's] right iliac region," which is between the upper part of the hip bone and the ribs and in the region of the colon. The doctor expressed the opinion that the stroke that produced that wound ruptured some small inside blood vessel, the flowing blood from which was emptied in the vacuum between the intestines and the inside lining of the body and which, as he stated, would produce the symptoms of which decedent complained, and that they would not necessarily be immediately felt but would manifest themselves only after the requisite amount of blood had accumulated to produce them. He

was not shaken on cross-examination, but rather grew more positive in his first expressed opinion. To say the least of it, his testimony was in accord with many other ones given by physicians generally in numerous cases coming before us under facts of similar import. No physician contradicted the testimony of Dr. Dotson, and we are far from being convinced that this necessary link in the proof of the commonwealth was determined by the jury without sufficient evidence, nor was the verdict on that issue flagrantly against the evidence, and for which reasons grounds 3 and 4 must also be disallowed.

5. The only criticism of the instructions made by counsel in discussing ground 5 are (c) that the court erred in giving an instruction on common law assault and battery and one on involuntary manslaughter, and (d) incorrect self-defense instruction. The argument in support of subdivision (c) is that at the time of the trial more than two years had elapsed since the fatal difficulty occurred and limitations had barred the prosecution for involuntary manslaughter, and for common-law assault and battery, and therefore those offenses should not have been submitted. But the trouble with that contention is that the returning of the indictment stopped the running of the statute of limitations and, since no bar had accrued up to that time, a trial for the misdemeanors could be had at any time thereafter. Moreover, the jury did not convict defendant of either misdemeanor, and which fact in and of itself puts this criticism out of the case, and for which reasons the argument is wholly without merit.

Criticism (d) is not sustained by the record. It is insisted in argument that the self-defense instruction assumed that defendant struck and killed decedent without expressly submitting that issue to the jury in the body of that instruction, although the issue had been properly submitted in other instructions. However, the criticized instruction starts out with the statement: "Although the jury may believe from the evidence beyond a reasonable doubt that the defendant struck, wounded and killed the deceased, etc., * * * yet, if at the time the defendant so struck and killed the deceased, etc." The statement that "the defendant so struck and killed the deceased" necessarily means a striking and *killing* which the jury might find from the evidence that he perpetrated "beyond a reasonable" doubt.

492

We have devoted more time and space to the consideration of the alleged errors relied on in this record than was necessary. But we have done so because of the apparent seriousness and earnestness of counsel in presenting them. The impression seems to prevail with, and the conviction appears to be held by, many members of the profession that those eligible for jury service are practically without the power of discernment and are wholly incapable of grasping and applying the principles of logic to any state of facts. The time may have been in the early history of the jury system that such apprehensions were well founded, and during which time more explicit caution was observed and practiced in order to protect the defendant on trial of a criminal charge from the consequences of misapprehension and erroneous conclusions of the members of the jury trying him. But in this enlightened age where most jurors have had the benefit of sufficient education to enable them to comprehend ordinary matters, and to construe ordinary language, the reasons for such strictness have largely disappeared. Therefore, our Legislature enacted sections 340 and 353 of our Criminal Code of Practice (the one relating to misdemeanors and the other to felonies), providing in substance that no judgment of conviction should be reversed for any error, unless the court is satisfied that the substantial rights of the defendant have been prejudiced thereby.

Following that rule we are forced to the conclusion that none of the errors complained of in counsel's brief, or appearing in the record, is sufficient to disturb the verdict or the judgment pronounced thereon, and for which reason it is affirmed.